UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GONZALEZ PRODUCTION SYSTEMS,
INC.,

       Plaintiff,

                                 Case No. 13-cv-11544
                                 Honorable Gershwin A. Drain

v.

MARTINREA INTERNATIONAL INC.,
MARTINREA HEAVY STAMPINGS INC.,

       Defendants and Counter-Plaintiff.
_____/

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#88] AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [#86]

### I. INTRODUCTION

Plaintiff, Gonzalez Production Systems, Inc. ("Gonzalez"), commenced this action on April 4, 2013 against Defendant Martinrea International Inc. ("Martinrea International"). *See* Dkt. No. 1. On May 17, 2013, Plaintiff filed an Amended Complaint adding Martinrea Heavy Stampings, Inc. ("Martinrea Stampings") as an additional Defendant in this dispute. *See* Dkt. No. 8. In the Amended Complaint, Plaintiff contends that both Martinrea International and Martinrea Stampings (collectively "Martinrea" or "Defendants"), are liable for breach of contract, or, in the alternative, liable in equity under the theory of promissory estoppel. *Id.*

On June 17, 2013, Defendant Martinrea Stampings filed a counterclaim against Plaintiff for breach of contract on behalf of Plaintiff. *See* Dkt. No. 201. Additionally, Martinrea has sought a declaratory judgment against Plaintiff regarding a purported settlement that occurred in November of 2011. *Id.*

Presently before the Court are two Motions for Summary Judgment filed by both the Plaintiff and the Defendants (collectively "the Parties"). The Defendants' Motion seeks Summary Judgment for the dismissal of Plaintiff's First Amendment Complaint. *See* Dkt. No. 88. Plaintiff's Motion seeks Summary Judgment on the Affirmative Defenses advanced by the Defendants, and Defendant Martinrea Stampings's request for a Declaratory Judgment regarding a disputed settlement that occurred in November of 2011. *See* Dkt. No. 86. Both Motions are fully briefed, and the Court heard oral argument on the Motions on November 13, 2014. For the following reasons, the Court will **DENY** Defendants' Motion [#88], and **GRANT** Plaintiff's Motion [#86].

## II. FACTUAL BACKGROUND

This case is a breach of contract action between automotive supply companies. Plaintiff, Gonzalez, is an automotive supplier that designs and builds robotic welding systems for its customers. Plaintiff's customers are automotive manufactures and other automotive suppliers. Defendants, Martinrea International and Martinrea Stampings, are an automotive supplier.

In October of 2010, Gonzalez and Martinrea entered into an agreement in which Gonzalez would manufacture an assembly line for Martinrea using Martinrea's equipment. The ultimate end user of the assembly line was the Ford Motor Company ("Ford"). The Parties agreed that Martinrea would supply the robots and other parts of the assembly line. The Parties, further, agreed that the assembly line should produce one part every 44.3 seconds.

Gonzalez began to make the assembly line using Martinrea's robots, weld guns, controllers, and other equipment. Throughout the process, Gonzalez purportedly advised Martinrea that it would need to use different equipment in order to create an assembly line that met the Parties' expectation. Martinrea insisted that Gonzalez use Martinrea's parts. Gonzalez

asserts that it spent a considerable amount of time attempting to make the system work with Martinrea's equipment.  Ultimately, it is undisputed that Gonzalez did not produce the desired assembly line as requested. The Parties dispute the cause of the failure to make a part in the desired time interval.

### III. LAW & ANALYSIS

#### A.      Standard of Review

The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Accordingly, pursuant to the *Erie* doctrine, Michigan law will govern the substantive issues raised herein while federal law will govern the procedural matters. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."); *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 417, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021, 85 L. Ed. 1477 (1941) (holding that federal courts sitting in diversity are to apply the choice-of-law rules of the state in which the court sits in order to resolve conflicts between state laws); *see also Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014).[1]

Federal Rule of Civil Procedure 56(a) empowers the court to render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the Court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored

---

[1] The Court also notes that the Parties have agreed that Michigan law will govern this dispute.

procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The evidence, and all reasonable inferences, must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

**B.      Legal Analysis**

As previously mentioned, both Parties have put forth Motions for Summary Judgment. Defendants' Motion seeks Summary Judgment for the dismissal of Plaintiff's First Amended Complaint. *See* Dkt. No. 88.  Plaintiff's Motion seeks Summary Judgment on the Affirmative Defenses advanced by the Defendants, and Defendant Martinrea Stampings's request for a Declaratory Judgment regarding the disputed settlement that occurred in November of 2011.  *See* Dkt. No. 86. The Court will address each Motion in turn.

**1.  Defendants' Motion**

Defendants seek summary judgment with regard to both of Plaintiff's claims.  Defendants argue that Plaintiff's Amended Complaint should be dismissed because the Plaintiff entered a "fixed-price contract" and it is undisputed that Plaintiff "never designed, built, and installed a Machine capable of the contractually required Cycle Time[.]" Dkt. No. 88 at 29.  Furthermore, the Defendants argue that Plaintiff's promissory estoppel claim should be dismissed in light of the Plaintiff's reliance on an alleged promise to engage in future negotiations despite the fact that there is an express contract covering "all labor and material necessary" to complete Plaintiff's work. *See* Dkt. No. 88 at 21.

Plaintiff frames the case in an entirely different manner.  According to Plaintiff, the Parties entered into a bilateral contract, whereupon the Defendants were the first party to breach their contractual responsibility.  *See* Dkt. No. 99 at 5.  Plaintiff maintains that there is "[v]oluminous evidence and witness testimony" that "demonstrates that Martinrea breached its contractual responsibilities to supply [] robots and related equipment necessary for Gonzalez to perform its work." *Id*.  Furthermore, while Defendants argue that there was only a promise to

engage in future negotiations; the Plaintiff argues that Defendants unambiguously promised to compensate Plaintiff for additional work completed. *Id.* at 14.

The Court agrees with Plaintiff. After reviewing the Motions, and examining the many Exhibits provided by both parties, the Court will deny Defendants' Motion for Summary Judgment because questions of fact exist with respect to critical issues in dispute. An explanation of the Courts reasoning is discussed herein.

### a. There Is No Pure Fixed-Price Contract

The Honorable Judge Marianne O. Battani in the Eastern District of Michigan neatly outlined the proper approach to contract interpretation by explaining that "[t]he cardinal rule of contract interpretation is to ascertain the intent of the parties." *Gerken Paving Inc. v. LaSalle Grp. Inc.*, No. 10-CV-14905, 2012 WL 3079249, at *4 (E.D. Mich. July 30, 2012) *aff'd*, 558 F. App'x 510 (6th Cir. 2014). The intent of parties is to be discerned from the agreement itself:

> [W]hen the language of an agreement leaves no doubt as to its meaning . . . it must be considered without regard to its extraneous facts. The intention of the parties is to be deduced from the language employed by them. The question is not what intention existed in the minds of the parties, but what intention was expressed in the language used; and where unambiguous, the terms of the [agreement] are conclusive.

*Id.* at *4-5 (quoting *Moore v. Kimball,* 291 Mich. 455, 461, 289 N.W. 213 (Mich. 1939), and citing *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.,* 469 Mich. 362, 666 N.W. 2d 251, 259 (Mich. 2003)).

In conducting its analysis, "[t]he court 'must look for the intent of the parties in the words used in the instrument.' " *Id.* (quoting *Mich. Chandelier Co. v. Morse,* 297 Mich. 41, 297 N.W. 64, 67 (Mich. 1941)). " 'The court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous. . . . .' " *Id.* (quoting *Morse,* 297 Mich. 41, 297 N.W. at 67). In Michigan,

-6-

The Law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest. It is not within the function of the judiciary to look outside of the instrument to get at the intention of the parties and then carry out that intention regardless of whether the instrument contains language sufficient to express it; but their sole duty is to find out what was meant by the language of the instrument.

*Id.* (quoting *Morse,* 297 Mich. 41, 297 N.W. at 67 (quoting 12 AM. JUR. pp. 746–48)).

Accordingly, when interpreting a contract, "[i]f the contract language is clear and unambiguous, its meaning is a question of law." *Gerken Paving Inc.*, 2012 WL 3079249 at *5 (quoting *Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist.,* 452 Mich. 309, 550 N.W.2d 228, 237 (1996)). When a contract provision is clear and unambiguous, "the terms are to be taken and understood in their plain, ordinary, and popular sense." *Id.* (citing *Clevenger v. Allstate Ins. Co.,* 443 Mich. 646, 505 N.W.2d 553, 557 (Mich. 1993)). Under Michigan law, "[a] contract which admits of but one interpretation is unambiguous." *Id.* (citing *Fragner v. Am. Cmty. Mut. Ins. Co.,* 199 Mich. App. 537, 502 N.W.2d 350, 352 (Mich. Ct. App. 1993)).

However, "[w]here the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." *Id.* (quoting *Port Huron Educ. Ass'n,* 452 Mich. 309, 550 N.W.2d at 237). Under Michigan law, "[a] contract is ambiguous if 'its words may reasonably be understood in different ways.' " *UAW–GM Human Res. Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486, 579 N.W.2d 411, 414 (1998) (quoting *Raska v. Farm Bureau Ins. Co.,* 412 Mich. 355, 314 N.W.2d 440, 441 (Mich.1982)).

If a contract is ambiguous, its meaning becomes a question of fact and the fact-finder must attempt to discern the Parties' intent. *See Gerken Paving Inc.*, 2012 WL 3079249 at *5. (citing *UAW–GM Human Res. Ctr.,* 228 Mich. App. 486, 579 N.W.2d at 414). If any ambiguity exists in the contract, the Court may refer to extrinsic evidence to determine the intent of the parties, but any ambiguity in the language of the contract must be construed against its drafter. *Id.* (citing *United Rentals (N.A.), Inc. v. Keizer,* 355 F.3d 399, 409 (6th Cir. 2004)). In

-7-

interpreting a contract, the court should read the contract as a whole and arrive at a construction that will give fair meaning to all of the language employed by the parties. *Id.* (citing *City of Wyandotte v. Consol. Rail Corp.,* 262 F.3d 581, 585 (6th Cir. 2001)).

Turning our attention to the contract at issue,[2] the Defendants assert that this was a pure fixed-price contract whereupon they essentially had no responsibilities because Plaintiff agreed, in exchange of the contract amount, "to furnish **all labor and material necessary** to design, build, tryout on our floor, teardown and ship the C520 Ford Front Side Rail & Apron Assembly System in 28 weeks." Dkt. No. 88 at 15 (emphasis in original). However, upon reviewing the explicit language in the agreement between the parties, the Court finds that this is not the case.

Specifically, on April 20, 2010, the Plaintiff only ***proposed*** to furnish all labor and material necessary. *See* Dkt. No. 99-5 at 2 ("***We propose*** to furnish all labor and material necessary to design, build, tryout on our floor, teardown and ship the C520 Ford Front Side Rail & Apron Assembly System . . . ."). Additionally, in the April 20, 2010 proposal, the Plaintiff gave the Defendants an option to supply 55 Robots. *See id.* at 6; *see also* Dkt. No. 99-4 at 3 (Defendants offering to supply "Bare 6-axis Robots (AAB IRB 6400)" in Defendants' request for Plaintiff's proposal from March 3, 2010).

The program assumptions for the agreement show that the Plaintiff was not required to supply all materials necessary, because the program assumptions explicitly detailed that Defendants were to supply "tryout material to support customer requirements," "all facilities work, including utility drops to tools/controllers within 20 feet (including buss plugs and fuses)," and "robots." Dkt. No. 99-6 at 3 (referring to the section labeled "4. Customer to Supply Items").

---

[2] According to the Parties, the contract consists of a March 2010 Request for Quotation issued by Martinrea, Dkt. No. 99-4; an April 2010 proposal from Gonzalez, Dkt. No. 99-5; Program Assumptions Dkt. No. 99-6; and an October 2010 Equipment Purchase Agreement, Dkt. No 99-7. *See* Dkt. No. 99 at 5 n.4; Dkt. No. 88 at 15.

Furthermore, the agreement specifically indicates that the functionality of the items supplied by the Defendants were the responsibility of the Defendants:

> ***The functionality of all customer supplied equipment is the responsibility of the customer.*** After inspection of these items, GPS will advise personnel of any items found defective. ***Any and all materials, new or used supplied by the customer, are the responsibility of the customer to warranty***.

*Id.* (emphases added).  Notably, in Defendants' Statement of Undisputed Facts, the Defendants acknowledge that "the October 2010 Agreement provided that Martinrea would supply 'Bare 6-axis robots (ABB IRB 6400),' " and that "Martinrea ***did supply*** fifty-five bare 6-axis ABB IRB 6400 robots ***as required by the Agreement***." Dkt. No. 88 at 17 (emphases added).

This being the case, the Court does not find—as the Defendants assert—that the contract at issue was a fixed price agreement whereupon the Plaintiff agreed to provide "all labor and materials necessary." Defendants are adamant that the Contract at issue is a pure fixed–price contract, but this is simply not the case.  As Defendants note, " '[a] pure fixed-price contract requires the contractor to furnish the goods or services for a fixed amount of compensation regardless of the costs of performance, thereby placing the risk of incurring unforeseen costs of performance on the contractor . . . .' " Dkt. No. 88 at 7 (quoting *Bowsher v. Merck & Co.*, 460 U.S. 824, 826 n.1, 103 S. Ct. 1587, 1590 n.1, 75 L. Ed. 2d 580 (1983).  Under a pure fixed-price contract, a contractor will assume the risks under the contract because the contractor is the one who furnishes all of the goods and services in exchange for a fixed price.

But, there is no pure fixed-price contract in this situation because the Plaintiff did not provide all of the goods and services.  Instead, it is undisputed that the Defendants agreed to supply, amongst other things, fifty-five Bare 6-axis robots (ABB IRB 6400). *See* Dkt. No. 88 at 17.  Consequently, the Court finds that there was a bilateral contract between the Parties because

-9-

both Parties had obligations as detailed by the unambiguous language from the agreement between them.

      **b. Summary Judgment is Not Warranted Because There Are Several Questions of Fact That Exists**

As discussed above, the Defendants have misconstrued the contract at issue as a pure fixed-price contract. In examining the contract at issue, for which both Parties' maintained obligations, the Court finds that several questions of fact that exists in determining the outcome of this case. Accordingly, the Court will deny Defendants' Motion for Summary Judgment.

      **i. Question of Fact Exist with Regard to Whether Additional Money is Owed Under the Contract**

According to the Defendants, the Contract amount is the only money that a fact finder could conclude the Defendants might be obligated to pay Plaintiffs due to the Terms of Payment in the Purchase Agreement between the Parties. *See* Dkt. No. 88 at 27 (referencing Dkt. No. 99-7 at 4 ("5. Terms of Payment")). According to the Defendants, Plaintiff only reached the first of five payment milestones, and the other milestones in the agreement could only be satisfied if the machine Plaintiff was supposed to supply met the required Cycle Time. *Id.*

The Plaintiff maintains that the Defendants' interpretation is "a misreading of the contract," because the Purchase Agreement "actually provides that full payment is due upon the earlier of the line being 'PPAD'd' or 'payment from Ford.'" Dkt. No. 99 at 21 (referencing Dkt. No. 99-7 at 4). Plaintiff asserts that Defendants are selling Ford parts that were produced by the machine made by Plaintiff—even if it did not reach the required Cycle Time—and that Defendants must pay Plaintiff for selling parts made on the machine designed by Plaintiff. *Id.*

The Court is not completely swayed by either framing of the argument. Defendants do not deny that the first milestone was completed, but argue that the "last four were never

achieved, because Gonzalez's Machines never ran at cycle time." Dkt. No. 88 at 21. According to Defendants, "[t]he second, third, fourth and fifth payment milestones under the Agreement could only be satisfied if (among other things) the Gonzalez Machine met the required Cycle Time." Dkt. No. 88 at 27. The Court does not agree with this interpretation of the contract.

Reading the unambiguous language of the contract, the "Terms of Payment" indicate that a successful run rate is required at the Third payment milestone, not the Second. *See* Dkt. No. 99-7 at 4 ("c) **Third payment in the amount of 15%** of the Equipment Price shall be payable upon a successful run at rate and debugging at Seller's premises"). The Second payment milestone only requires machine assembly completion at Defendants' facility. *Id.* ("b) **Second payment in the amount of 35%** of the Equipment Price shall be due payable upon machine assembly completion at the Sellers' facility.").

Similarly, the Court does not agree with Plaintiff's interpretation of the contract. Plaintiff argues that because Defendants have received some payment from Ford, Plaintiff is entitled to payment as well. Dkt. No. 99 at 21. However, reading the unambiguous language of the contract, the PPAP language on which the Plaintiff relies is mentioned under the Fourth and Fifth payment milestones, which are notably after the Third milestone which requires a successful run rate. *See* Dkt. No. 99-7 at 4.

In sum, the Court finds that a question of fact exist with respect to whether the Plaintiff was paid everything owed under the contract. At the summary judgment stage, the Court is required to look at the evidence in the light most favorable to the non-moving party. Looking at the evidence provided, the Court cannot say, as a matter of law that no additional money is owed. For example, Plaintiff has produced testimony from its CFO that with respect to Purchase Order 6933, Plaintiff issued an invoice for $747,608.50, and that Defendants have not paid $116,433.64

-11-

of the owed amount. *See* Dkt. No. 100-32 at 7 ("I have given you facts that we did invoice based on milestones in the PO, and Martinrea, in fact, paid on those milestones, so that's a fact."); *id.* at 8 (referencing Dkt. No. 15-8, to note that Defendants took an "arbitrary deduction of $116,443.64").

Additionally, there is testimony that Defendants indicated they refused to pay money owed. *See, e.g.*, Dkt. No. 100-32 at 8 (testimony from Plaintiff explaining that some invoices were not issued for a full amount because Defendant said "We're not paying that."); Dkt. No. 99-11 (Expert Witness testifying that Gonzalez's damages include approximately $1.1 million in payments that Defendants failed to pay Plaintiff pursuant to the parties contract."). The Court reiterates that, per the terms of the agreement, the Second milestone could be achieved without meeting the required Cycle Time. Given the facts as presented, it is evident that Defendants continued making payments past the first milestone, and looking at the evidence in a light most favorable to the non-moving party, the Court finds that a question of fact exist regarding whether additional money is owed under the terms of the agreement.

### ii. Question of Fact Exist with Regard to Whether Defendants Breached the "Customer to Supply Items" Provisions of the Agreement

Next, Defendants assert that any alleged breach of their responsibility to supply items is irrelevant to the cause of action because "Count I alleges a breach of payment obligation only." Dkt. No. 88 at 30. Furthermore, the Defendants allege that Plaintiff's promissory estoppel claim in Count II should be barred because the Defendants assert that the purportedly actionable promise on which Plaintiff relied was merely a promise to engage in negotiations in the future. *Id.* at 31-32.

Defendants explain that Plaintiff "claims it spent a total of $10 million in 'costs' . . . for the 'labor and material necessary' to perform the Agreement." Dkt. No. 110. According to the

Defendants, "[t]his, even if true, is entirely immaterial[,]" because "Gonzalez assumed this risk when it accepted a fixed price contract." *Id.*

Plaintiff emphasizes that it did "not 'assume the risk' that Martinrea would breach its promise" to supply items as specified in the agreement between the parties. *See* Dkt. No. 99 at 19. According to the Plaintiff, "[t]he damages Gonzalez wrongly incurred addressing unfit equipment should be compensated," and Plaintiff's Amended Complaint advances the "two alternative legal grounds for awarding these damages." *Id.* at 19-20 (citing Fed. R. Civ. P. 8(a)(3), for the proposition that the Defendants may include relief in the alternative).

Specifically, Plaintiff contends that it has properly asserted the following two counts, which entitle it to legal relief:

> [1] [B]reach of contract damages (that is, breach of Martinrea's responsibility to supply industry-standard free issue equipment) or [2] alternatively, pursuant to an award in equity based on promissory estoppel (i.e. an order in equity requiring Martinrea to pay for the extra work Martinrea promised to compensate Gonzalez for but wrongly never did.

*Id.* To the extent that Plaintiff is arguing Defendants would be liable for purportedly breaching the contract by failing to provide equipment as specified in the terms of the agreement between the parties, the Court agrees.

If, as a result of a Defendants breach of the explicit terms of the contract, Plaintiff was required to incur additional costs in an attempt to uphold its end of the bargain, the Court finds that Plaintiff would be entitled to damages under Michigan law.[3] "Michigan law follows the rule of *Hadley v. Baxendale,* 156 Eng. Rep. 145 (1854), that 'the damages recoverable for breach of contract are those that arise naturally from the breach or those that were in the contemplation of

---

[3] The Court finds that this would not fall under the Uniform Commercial Code. Defendants essentially provided services—robots and equipment—to Plaintiffs, but did not sell any goods. *See Wells v. 10-X Mfg. Co.*, 609 F.2d 248, 254 (6th Cir. 1979) ("[T]he fact that the party supplying a service does so in conjunction with the delivery of goods does not necessarily mean that the transaction comes within the [Uniform Commercial] Code. . . . Irrespective of the fact that performance under the terms of the contract would have resulted in the special manufacture of goods, the contract was one for the rendition of services.").

the parties at the time the contract was made.' " *Salamey v. Aetna Cas. & Sur. Co.,* 741 F.2d 874, 877 (6th Cir. 1984) (quoting *Kewin v. Massachusetts Mutual Life Ins. Co.,* 409 Mich. 401, 414, 295 N.W.2d 50, 52–53 (Mich. 1980)).  In the context of commercial contracts, this "generally results in a limitation of damages to the monetary value of the contract had the breaching party fully performed under it." *Kewin,* 409 Mich. at 415, 295 N.W.2d at 53. [4]

This Court previously indicated that it was unnecessary for the Plaintiff to amend its complaint seeking equitable relief such as unjust compensation because the Parties' express contract governs all disputes. *See* Dkt. No. 69 at 4.  The Court did not rule, as Defendants imply, that there was an express, pure fixed price contract that prevents the Plaintiff from receiving damages for Defendants' alleged breach of the contract.

Defendants attempt to minimize the importance of the equipment they provided by arguing that they repaired and replaced any issues that arose with the equipment they supplied. However, Plaintiff maintains that the equipment provided by Defendant was not functional, as agreed upon by both parties, and that there is voluminous evidence and witness testimony demonstrating that Defendants breached their contractual responsibilities to supply and maintain the robots and related equipment necessary for Plaintiff to perform its work. *See*, *e.g.*, Dkt. No. 99-3 at 8-9 (Rows 27-31 outlining specific competing testimony); Dkt. No. 99 at 13-16 (listing testimony of alleged failed repairs and poor condition of equipment provided; Dkt. No. 100-14 (a 2009 document from a robot manufacturer explaining that Defendants needed to ensure preventative maintenance for the robots used by Defendants); Dkt. No. 99-11 (Sworn Affidavit From Lawrence A. Simon, C.P.A., testifying as an expert witness that "Gonzalez's damages

---

[4] The Court also notes that "Michigan law requires the injured party, in both contract and tort actions, to make every reasonable effort to minimize damages suffered." *Wells v. 10-X Mfg. Co.*, 609 F.2d 248, 256 (6th Cir. 1979) (citations omitted); *see also Morris v. Clawson Tank Co.*, 459 Mich. 256, 263, 587 N.W.2d 253, 257 (1998) ("Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages. The person wronged cannot recover for any item of damage which could thus have been avoided.").

-14-

include over $6 million in damages stemming from Gonzalez's costs incurred in attempt to get the Martinrea-provided robots and related items as functional, adjusted for reasonable markup."). Given the competing and contradictory facts, the Court finds that a question of fact exist with respect to whether the Defendants breached the contract.

### iii.   Question of Fact Exist with Respect to Whether There Was a Promise on Which Plaintiff's Reasonably Relied

Similarly, with respect to the promissory estoppel claim, the Court finds that there is a question of fact regarding the promises that were made to Plaintiff. Defendants allege that Plaintiff's promissory estoppel claim in Count II should be barred because the Defendants assert that the purportedly actionable promise on which Plaintiff relied was merely a promise to engage in negotiations in the future. *Id.* at 31-32.

While the Defendant is correct that the Ron Pearce indicated that there was a promise to engage in negotiations in the future, the Defendants have alleged multiple purported instances of promises upon which they relied on a promise by Defendants. *See*, *e.g.*, Dkt. No 100-30 at 2 (Email of Dan Saldana to David Hayes stating: "In accordance with our position since the start of this project, ***anything*** that is outside of Gonzalez' contracted scope will be paid as an adder); *compare* Dkt. No. 100-13 at 4 (Dan Saldana of Defendant stating: "What I told Gonzalez was that they were going to receive ***fully functional*** ARB IRB 6400s"), *with* Dkt. No. 100-12 at 6 (David Hayes of Plaintiff stating "I could take a visual look at the robots and understand they were tired . . . I would hear from people like the robot manager, the facility manager, that the condition of the robots were not as what we expected, they were not reconditioned, they were just delivered.").   Given the factual dispute regarding whether there was a clear and definite promise about the functionality of the robots, the Court finds that a question of fact exist for the jury to determine if there was in fact a clear and definite promise.

-15-

2. **Plaintiff's Motion**

Plaintiff seeks Summary Judgment on two of the affirmative defenses pled by Defendants: (1) that Plaintiff's claims are barred by settlement, and (2) that Plaintiff's claims are barred by release. *See* Dkt. No. 86 at 7 (referencing Dkt. No. 14 at 47 (Affirmative Defense 7 (settlement) and 10 (release)).   Additionally, Plaintiff seeks to dismiss Defendant Martinrea Stamping's Counterclaim at Count II, seeking a declaratory judgment on the issue of Purchase order 600006933 representing a full settlement and release on any and all claims for additional compensation. *Id.*

Plaintiff argues that the Parties "never even discussed a settlement agreement, let alone signed one[,]" and that Defendants settlement and release theory hinges on an "implied settlement" that Michigan law does not recognize. *See* Dkt. No. 86 at 8. To the contrary, the Defendants point to purported admissions by the Plaintiff that "there was definitely a settlement[,]" to support their opposition to the Plaintiff's Motion. Dkt. No. 101 at 8.

The Court agrees with Plaintiff on this issue.   After reviewing the Motions, and examining the many Exhibits provided by the Parties, the Court will grant Plaintiff's Motion for Summary Judgment as a matter of law.   The Defendants have not demonstrated that there was an unambiguous settlement and release, and, accordingly, the Court will grant Plaintiff's Motion for Summary Judgment.

Under Michigan law, which the parties have agreed governs the instant dispute, "[a]n agreement to settle a pending lawsuit is a contract and is to be governed by the legal principles applicable to the construction and interpretation of contracts." *Converge, Inc. v. Topy Am., Inc.*, 316 F. App'x 401, 404-05 (6th Cir. 2009) (citing *Kloian v. Domino's Pizza L.L.C.,* 273 Mich. App. 449, 452, 733 N.W.2d 766 (2006)).   The interpretation of whether a contract is

-16-

unambiguous and unequivocal is a question of law. *In re Loose,* 201 Mich. App. 361, 366, 505 N.W.2d 922 (1993).  As discussed previously, "[t]he primary goal of contract interpretation is to honor the intent of the parties." *Old Kent Bank v. Sobczak,* 243 Mich. App. 57, 63, 620 N.W.2d 663 (2000).

It is important to note that "a contract requires mutual assent or a meeting of the minds on all the essential terms." *Kloian*, 273 Mich. App at 453, 733 N.W.2d at 770.  " 'A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind.' " *Id.* (quoting *Kamalnath v. Mercy Mem. Hosp. Corp.,* 194 Mich. App. 543, 548, 487 N.W.2d 499 (1992)).  " 'Before a contract can be completed, there must be an offer and acceptance.' " *Young v. Gregory J. Auto Sales, Inc.*, No. 13-13264, 2014 WL 1317495, at *2 (E.D. Mich. Apr. 1, 2014) (quoting *Kloian*, 273 Mich. App. at 452, 733 N.W.2d at 770). " 'An acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Id.* (quoting *Kloian*, 273 Mich. App at. 453–54, 733 N.W.2d at 771 (quoting *Blackburne & Brown Mortg. Co. v. Ziomek,* 264 Mich. App. 615, 626–27, 692 N.W.2d 388 (2004)).

After a valid contract has been formed, the Court may still enforce a settlement agreement between parties even after a unilateral change of mind. *See Reed v. Citizens Ins. Co. of Amer.,* 198 Mich. App. 443, 447, 499 N.W.2d 22, 24 (1993) (holding that a unilateral change of mind is not an adequate ground to excuse performance of a contract to settle legal claims) (overruled on other grounds in *Griffith v. State Farm Mut. Auto. Ins. Co.,* 472 Mich. 521, 540, 697 N.W.2d 895 (2005)) (citing *Thomas v. Mich. Mut. Ins. Co.,* 138 Mich. App. 115, 118, 358

-17-

N.W.2d 902 (1984) ("Settlement agreements should not normally be set aside and ... once a settlement agreement is reached a party cannot disavow it merely because it has had a 'change of heart.' ")). Additionally, "[a] valid settlement agreement need not be premised on a writing at all, let alone a writing signed by all of the parties." *Mich. Reg'l Counsel of Carpenters v. New Century Bancorp Inc.,* 99 Fed. App'x 15, 21–23 (6th Cir. 2004) (enforcing a settlement agreement where all parties did not sign the settlement agreement, but all parties, by expressions of assent, agreed to the material terms of the settlement agreement).

### a. The Court Does Not Have Sufficient Information to Definitively Examine the Disputed Purchase Agreements

The contention between the parties regards a dispute about whether additional payment is owed regarding two Purchase Orders.  The Court begins by looking at the Purchase Orders themselves. *See* Dkt. No. 86-2 (Purchase Order PO6000006933); Dkt. No. 86-3 (Purchase Order PO6000006934).  Each of the Purchase Orders was executed on November 26, 2011.  *See* Dkt. No. 86-2 at 2; Dkt. No. 86-3 at 2.  Each Purchase Order indicates that it "is subject to: PURCHASE ORDER CONDITIONS located on www.martinrea.com/poconditions.htm". Dkt. No. 86-2 at 7; Dkt. No. 86-3 at 2.

Unfortunately, the Court does not have the terms of the Purchase Order Conditions as of November 26, 2011. Effective March 1, 2013, however, the Purchase Order Conditions indicate that the Order "contains the entire agreement between Buyer and Seller and, except as otherwise expressly stated in this Order, supersedes all prior agreements, orders, quotations, proposals and other communications relating to the subject matter hereof and there are no other understandings or agreements, verbal or otherwise, in relation hereto that exist between Buyer and Seller." Dkt. No. 86-13 at 2.  Additionally, there is an express indication that neither party to the agreement waives its rights to any "rights remedies, breaches or defaults[.]"  *Id.* at 16.

-18-

However, the court cannot say that the terms of the Purchase Order Agreement provided—which is effective March 2013—are the same as of Agreement in November 26, 2011. If they were, the Court could possibly determine that the unambiguous language of the Purchase Order was a complete integration of the agreement between the Parties. However, the Court has not been provided with Purchase Order Agreement that was in effect as of November 26, 2011. Accordingly, the Court cannot find that the Purchase Order Conditions control the Purchase Orders at issue.

### b. Nonetheless, the Court Has Not Been Presented With Evidence of a Clear and Unambiguous Agreement Between the Parties

Nevertheless, the Court will grant Plaintiff's Motion because there is no written settlement agreement, and the Court has not been provided with evidence that there was mutual assent to material terms of a settlement agreement. Looking at the evidence in the light most favorable to the Defendants, the Court finds that Defendants have, at most, demonstrated that Plaintiff "settled" changes to the purchase orders at issue; not that Plaintiff settled all disputes that could arise out of the purchase order.

In the present matter, Defendant presents no evidence suggesting that a written settlement agreement was reached between the parties to settle the matter at issue. Nevertheless, as the Court has mentioned "[a] valid settlement agreement need not be premised on a writing at all, let alone a writing signed by all of the parties." *Mich. Reg'l Counsel of Carpenters,* 99 Fed. App'x at 21–23 (enforcing a settlement agreement where all parties did not sign the settlement agreement, but all parties, by expressions of assent, agreed to the material terms of the settlement agreement).

Accordingly, it is critical that the Defendants demonstrate that there was "mutual assent or a meeting of the minds on all the essential terms." *Kloian*, 273 Mich. App at 453, 733 N.W.2d

-19-

at 770. To reiterate " '[a] meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind.' " *Id.* (quoting *Kamalnath,* 194 Mich. App. at 548, 487 N.W. 2d 499).

According to Defendants, Ron Pearce negotiated the " 'ECN' settlement" on behalf of Plaintiff and "unequivocally admitted the existence of a settlement[.]"   Dkt. No. 101 at 10. Specifically, the Defendants reference the following deposition testimony from Mr. Pearce:

> Q.  And we discussed at that time this negotiation and settlement of the then-presented ECNs that culminated in the issuance of the purchase order in November of 2011, correct?
> **A.  That is when the purchase order was issued, yes; that's not when <u>we settled the changes.</u>**
> Q.  When do you contend Gonzalez settled the changes?
> A.  In August of 2011.
> Q.  And what do you base that upon?
> A.  <u>**I was at the meetings and settled them with Dan Saldana**</u>.

Dkt. No. 101 at 10 (quoting Dkt. No. 101-2) (emphasis in the original).  In order to support their contention that the Plaintiff intended to settle, the Defendants also submitted as additional evidence the fact that Mr. Pearce circulated an internal document stating: "Before we settle with Martinrea we need to do our homework for the cost implications for the various issues that Martinrea caused." Dkt. No. 101 at 11 (quoting Dkt. No. 103 at 3).

However, this document and the deposition testimony of Mr. Pearce fail to show that there was mutual assent or a meeting of the minds on all essential terms. After going through the evidence provided by the Defendants, the Court is not able to decipher, exactly, the essential terms of this purported settlement agreement.  The foundation of Defendants' assertion that there was a settlement agreement relies on Mr. Pearce's indication that he settled changes with Defendants.

Nonetheless, as the Plaintiff aptly notes the word "settle" has various meanings.  *See* Dkt. No. 86 at 16.   In fact, the Plaintiff directs the Court to testimony by Mr. Pearce where he indicates that when he used the word "settled" he was referencing the fact that he had reached the end of a negotiation; not settling legal claims:

> Q. And you actually used the word settle because it was your understanding and intent that the parties were going to enter into negotiations for the purpose of reaching a settlement, correct?
> A. When I negotiate changes when we get to the end and finish negotiations, then I would usually paraphrase that as settlement, but not in a legal term, just in a fact that these issues had been negotiated….To me, settle and negotiation are the same thing.

*See* Dkt. No. 86 (quoting Dkt. No. 95-16 at 5-6). This dispute about Mr. Pearce's subjective state of mind is the exact reason why a meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind.

When examining the Defendants' supporting evidence that could demonstrate an objective meeting of the minds—Mr. Pearce's email that he prepared to settle the dispute—the Court notes that the subject of the email by Mr. Pearce indicates that the settlement he referenced regarded "Martinrea changes;" not a resolution of all disputes.  Dkt. No. 103 at 3.  Thus, even viewing the evidence in the light most favorable to the non-moving party, the Defendants have, at most, demonstrated that Plaintiff  settled "changes" to the purchase orders at issue; not that Plaintiff settled all disputes that could arise out of the purchase order.

Defendants additionally argue that the parties negotiated a compromise on the ECN's that are identified in the Purchase Orders and that the Purchase Orders incorporate the ECN's. Dkt. No. 101 at 22.  But even assuming that the Purchase Orders did incorporate the ECN's identified, the Defendants have not shown that there was unambiguous language in these ECN's showing that there was an agreement to settle and release the legal claims. In sum, the Defendants have

not demonstrated a meeting of the minds nor a clear and unambiguous agreement between the parties.

## IV. CONCLUSION

For the reasons discussed herein, the Court will **DENY** Defendants' Motion [#88], and **GRANT** Plaintiff's Motion [#86].

Defendants Affirmative Defenses 7 and 10 are **HEREBY DISMISSED**.

Count II of Defendant Martinrea Heavy Stampings, Inc.'s counterclaim is **HEREBY DISMISSED**.

SO ORDERED.

Dated: November 17, 2014

/s/Gershwin A Drain
Hon. Gershwin A. Drain
United States District Court Judge
